## Charles H. Aldrich, Appellee, v. Lee D. Mathias, Appellant.

## Gen. No. 16,007.

1. NEGOTIABLE INSTRUMENTS—*when want of consideration cannot be shown.* In an action upon promissory notes, the defense of a want of consideration cannot be shown, if, in order to do so, it is necessary to open up partnership accounts which have been settled by agreement of the parties.

2. PARTNERSHIP—*jurisdiction in matters of account.* A court of equity has exclusive jurisdiction to settle and determine disputed items involved in a partnership accounting.

3. ASSUMPSIT—*what does not preclude maintenance of action.* The fact that promissory notes sued on, represent a settlement between the partners of their accounts as such, does not preclude an action thereon in a court of law.

Appeal from the County Court of Cook county; the HON. DAVID T. SMILEY, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed February 26, 1912.

GOODRICH, VINCENT & BRADLEY, for appellant.

GEORGE W. PLUMMER and CHARLES G. McROBERTS, for appellee.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

The plaintiff, Aldrich, sued the defendant, Mathias, before a justice of the peace in January, 1906, on seven promissory notes payable to Aldrich, signed by Mathias, each for $25. They were dated February 28, 1904, and due respectively on the 15th days of June, July, August, September, October, November and December, 1904. Aldrich recovered a judgment before the justice on these notes for $196 and costs of suit. The defendant Mathias appealed to the County Court of Cook county. There were no written pleadings before the justice or in the County Court. A jury in the

County Court returned a verdict for the defendant, but the Judge sitting in the County Court, on motion of the plaintiff, entered a judgment *non obstante veredicto* in favor of the plaintiff for $205.62 and costs. The defendant appealed to this Court and the Branch Appellate Court on June 16, 1908, reversed the judgment on the ground that there being no formal written pleadings required before the justice, the general issue was presumed to have been pleaded, and that in the face of a good plea the plaintiff could not have a judgment *non obstante veredicto*. The cause was remanded to the County Court "for such proceedings subsequent to verdict as the Court might deem proper." Presumably the verdict was set aside and a new trial granted, for the cause comes up to us again on an appeal from a judgment of the County Court for $219.85 and costs rendered on a directed verdict of a jury returned December 24, 1908.

After the verdict a motion was made by the defendant for a new trial on written grounds and denied by the Court. A motion to arrest the judgment on the same grounds was also denied.

The defendant at the trial produced certain evidence which was received, and tendered much besides which on objection was excluded.

The argument here for appellee describes the holding below with substantial accuracy in the statement, "The trial Court held that this proposed testimony, and the documents tendered in connection with it, involved an opening up of partnership matters which the partners had settled among themselves, and that a court of law with a jury to decide the issues was not the proper forum for such defense, and refused to allow the testimony to go to the jury." We think it might be added that all the evidence adduced by the defendant and that offered would not together, even if the latter had been admitted, have made a defense

justifying any other verdict and judgment than that rendered.

The notes sued on were seven of a series of forty-three given in accordance and connection with an agreement between the parties, dated May 29, 1904. The notes were then executed and dated back to February 28th.

This agreement, which was introduced in evidence, recites the giving of the notes by Mathias to Aldrich, and provides that "Whereas there are certain accounts due the late firm of Aldrich, Mathias & Phipps, in all which accounts Mathias has an interest equal to fifteen per cent," upon collection being made on them the share of Mathias shall be credited on the notes last maturing; that Mathias will, if he is able, in certain contingencies, anticipate payments, and that Aldrich will assist Mathias, so that the payments shall cause as little inconvenience as possible.

The agreement of May 29, 1904, and the giving of the notes was the sequel of an agreement entered into on March 1, 1902, by Aldrich, Mathias and a third lawyer named Phipps. The three up to that time had been partners in a law firm under the name of Aldrich, Mathias & Phipps. At that time the partnership was dissolved. The books of the firm showed that the plaintiff Mathias had drawn more of the receipts than his share according to the partnership agreement, and that on a settlement of the partnership affairs without further realization on the assets Mathias would be indebted to Aldrich. The agreement of March 1, 1902, was as follows:

"Articles of Agreement entered into this 1st day of March, A. D. 1902, WITNESSETH:

THAT the partnership heretofore existing between the undersigned under the firm name of ALDRICH, MATHIAS & PHIPPS is dissolved by mutual consent.

The books shall be closed and the dissolution date from the evening of February 28th, 1902. Charles H.

Aldrich will retain the custody of the books and papers of the late firm, collect all accounts due to it and pay all debts against the said firm, paying the surplus, if any, after paying said debts and the amount due and to become due to Charles H. Aldrich by reason of advancements, to Lee D. Mathias and Park Phipps according to their interest in said firm.

Clients of the firm shall be permitted to designate without solicitation the member of the firm by whom they desire their business hereafter conducted, and upon such designation being made such member shall be entitled to the papers pertaining to such client's business.

The stock in the Chicago Cattle Company shall be retained by Charles H. Aldrich to secure advancements and overdrafts *and if within two years from this date such advancements and overdrafts shall not be fully paid, then the undersigned Lee D. Mathias and Park Phipps severally but not jointly agree to pay upon demand his proportionate share of such overdraft remaining unpaid.*

The books of Aldrich, Mathias and Phipps shall be continued without cost or expense to Lee D. Mathias or Park Phipps, and the said Mathias and Phipps shall have access thereto at all proper times for the purpose of examining the same or taking copies thereof.

In the liquidation of the accounts due the firm no member of the firm shall extend the time or make diminution of the amount due from clients as shown by the books on the evening of February 28th without the consent of all the members of the firm first had thereto.

IN WITNESS WHEREOF the parties have hereunto set their hands and seals the day and year first herein named.

Charles H. Aldrich    (SEAL).
Lee D. Mathias    (SEAL).
Park Phipps    (SEAL)."

(The italics are ours.)

It is conceded that on May 29, 1904, when the notes were given, the books then showed that the amount

for which they were given was the amount in which Mathias appeared, on account of the partnership affairs, to be indebted to Aldrich after the two years' liquidation provided for in this agreement of March 1, 1902, had gone on.

By leading questions which were put by defendant's counsel on the trial of this cause below to the defendant and to one F. C. Rutan and one John A. McShane, who were called as witnesses by the defendant, which questions were apparently treated by the parties and will be treated by us as offers to prove the recitals embodied in them, we are informed of the defense which the defendant desired to introduce to the notes. These questions were all objected to by the plaintiff and ruled out. The defendant excepted in each case and complains here of the exclusion of the evidence thus impliedly offered, and of the directed verdict which, when this evidence was excluded, was inevitable.

The defense thus outlined was that in September or October, 1905, about a year and a half after the giving of the notes, Mr. Mathias dined with Rutan and McShane at a hotel in Chicago, and in conversation with them then learned for the first time certain facts concerning a contract between Rutan and McShane, which showed that the plaintiff Aldrich had, by wrongful conduct, induced him, Mathias, to accept on August 1, 1901 (seven months before the firm of Aldrich, Mathias & Phipps was dissolved) as an asset of the firm, a charge of $30,000 against McShane (which charge would have otherwise been the property of Aldrich) in lieu of a charge that should rightfully have been made by the firm against Aldrich himself for time he had devoted to his own business in violation of the partnership agreement; that had such charge against Aldrich been made, the books would not have shown Mathias overdrawn or indebted to Aldrich on March 1, 1902, or May 29, 1904, and the

notes would not have been given. The notes were therefore, it is claimed, without consideration.

The facts actually shown by the evidence admitted and those implied in the questions rejected about this exchange of charges constituted the proffered defense. They were these:

The original partnership was between Aldrich, Mathias & Phipps and a fourth party, one James D. Andrews. It was entered into by written agreement dated May 21, 1900. Andrews retired in November, 1900, and by supplemental agreement the business was continued "by the other members of the firm under the name of Aldrich, Mathias & Phipps, to whom" (we quote from the agreement) "all accounts belong," "and by whom all indebtedness of the firm has been assumed." (Certain exceptions as to accounts and liabilities were made in the supplementary agreement, but they are not involved in or material to this statement). On the first of April, 1901, another agreement "continued and renewed" the partnership of Aldrich, Mathias & Phipps, and under this renewal the firm continued to act until the dissolution by agreement already recited on March 1, 1902. The only changes made by the renewal agreement of April 1, 1901, of the original partnership terms were the increase of the share of Mathias and Phipps, respectively, in the profits from 10 to 15 per cent each (to date from the withdrawal of Andrews), and a release of Aldrich from a guaranty existing in the original contract as to the amount of net income to be derived by his partners from the business. We may therefore consider the provisions of the original agreement of May 21, 1900, as those involved in this discussion.

This original agreement of May 21, 1900, after providing for the membership and style of the firm and the respective interests of the parties, contained some stipulations about the payments of current expenses,

distribution of profits and management of firm funds, and the following clauses claimed by the plaintiff to bear on the matters put forward as a defence to the notes sued on in this case:

"7. It is understood and agreed that all moneys collected or received by any member hereof on account of the business of the firm shall be immediately turned into the treasury of the firm. * * *

9. It is also understood and agreed that in the prosecution of the business of the said partnership each partner shall keep a personal journal and each hereby agrees daily to write up a true and correct account of the business upon which he is engaged, with such charges as he has made in such a manner as will enable the bookkeeper to make the proper charges upon the firm books. * * *

11. It is further understood that the current and unfinished business of Charles H. Aldrich shall be taken over by the partnership, and in the final settlement of all such business due allowance shall be made for the work done by the firm from this date to the date of the completion of any such business, and the balance, if any, shall be paid to Mr. Aldrich on account of services heretofore rendered prior to the beginning of this partnership.

12. It is understood that the fee heretofore agreed upon between Mr. Aldrich and Byrd Syndicate, Limited, is the property of Mr. Aldrich when paid, also the fees arising from the sale of the Byrd, Culmer, St. Louis and other properties, also from the Company taking over the Simpson business in New York, provided, however, that said Aldrich shall in the event of success therein make due allowance to the partnership for such time as he may give to such business after this date, and if unsuccessful therein no allowance to be made for such time.—all other business done or upon which said Aldrich has heretofore

or shall hereafter enter, to be deemed partnership business for all the purposes of this agreement.

13. Each and every member of the partnership agrees to devote his time and energies to the interests of the partnership, and to accept no employment requiring time or effort aside from the partnership business.''

August 1, 1901, Mr. Aldrich made the following charge upon his personal day book provided for in the partnership agreement, to be carried therefrom to the books of the firm:

"Chicago, Aug. 1st, 1901.
Omaha-Texas Syndicate.

To services in connection with promotion of oil syndicate and disposition of lands which is payable contingently from oil marketed from lands and when marketed at the rate of one cent per barrel until total sum is paid,............................$30,000.''

At the same time the three partners signed the following document:

"August 1, 1901.
Memorandum.

Whereas Mr. Aldrich has made a charge on his books, under date of August 1, 1901, against the Omaha-Texas Syndicate for services as expressed on his Day Book amounting to $30,000.00 this memorandum is designed to show that it is the understanding that this sum is payable by John A. McShane on the terms and conditions set forth in correspondence between Mr. Aldrich and John A. McShane in the files and Mr. McShane's answer, which correspondence will be found in an envelope in Mr. Aldrich's strong box. The only additional matter to be taken into account in the said settlement is that Mr. McShane does not have this liability to us if he is compelled to pay F. C. Rutan. He has agreed however to resist any payment to Mr. Rutan through all the courts, and we on our part to perform all legal services required in making such resistance without expenses. This money, if

and when received, is subject to the existing partnership arrangement.

> Charles H. Aldrich,
> Lee D. Mathias,
> Park Phipps.''

Although no reference to any prior ownership of this claim for services was made in the terms of the entry or of the contemporaneous memorandum, the defendant proposed to show that this claim for services was in connection with ''the sale of the Byrd, Culmer, St. Louis and other properties'' referred to in Paragraph 12 of the partnership agreement, and must therefore, under that agreement, have been, if it existed at all, the property of Aldrich.

He also proposed to show that at the time the charge was entered and the memorandum made on August 1, 1901, Aldrich stated to him, Mathias, that he, Aldrich, felt that he had devoted a great deal of time to his personal business, and that under the provisions of the partnership contract his partners had a claim against him on account of this, and that he had consequently decided to assign to the firm, in lieu of the charge that might properly be made against him for the time thus devoted to personal matters, this fee of $30,000 which he said he had earned.

Further the defendant proposed to show that he had then asked Aldrich whether the fee would be paid, and that Aldrich told him it was good; that Aldrich presented him the memorandum and that he, Mathias, asked Aldrich what the reference to Rutan meant, and that Aldrich replied that Rutan's claim was merely colorable and that the fee would unquestionably be collected by the firm.

In the memorandum, it will be noted, it is stated that the charge is ''payable by John A. McShane on the terms and conditions set forth in a correspondence between Mr. Aldrich and John A. McShane,'' ''which correspondence will be found in an envelope in Mr. Aldrich's strong box.''

It does not, appear that the defendant makes any claim that he then, or when he gave the notes three years afterward, or at any time before September, 1905, after his conversation at dinner with Rutan and McShane, asked to see or took any pains to see the correspondence in question. He proposed to show, however, that when the charge and memorandum were made "he did not know much about the transaction, and did not have much of anything to do with Mr. Rutan's business or the Byrd Syndicate business." He also proposed to show that at or about the time of the execution of the notes in May, 1904, he told Aldrich that it did not seem fair to him (Mathias) that he should give the notes in question considering the relative amount of business brought to the firm by the partners, and that Aldrich again assured him that the charge against the "Omaha-Texas Syndicate" was a valid charge and would be collected sometime; that 15 per cent of it would amount to $4,500, and that consequently the defendant would not fare so badly for his two years' work in the firm.

After his conversation with Rutan and McShane in September or October, 1905, the plaintiff says he saw, for the first time, the correspondence alluded to, presumably on request to Aldrich, as he proposed to show that he then called on Aldrich and accused him of acting dishonestly "in charging that big fee on the books of the firm" in lieu of a charge properly to be made against Aldrich for the time devoted to his personal matters,—the ground of such accusation being that the claim of Rutan was "good" and not merely "colorable," and the claim of Aldrich merely "colorable" and not "good."

To prove this ground the defendant endeavored to introduce an agreement of lease from some oil lands in Texas dated November 2, 1899, from McShane and Creighton of Omaha—presumably the "Omaha-Texas

Syndicate''—to one Graham, an assignment of the same from Graham to the ''Byrd Syndicate'' of London, and another agreement of lease dated May 18, 1901, from McShane and Creighton direct to the ''Byrd Syndicate'' of ''substantially the same lands.'' He also offered to show that when the second agreement was made the first was cancelled and a suit between McShane and the Byrd Syndicate dropped.

He also proposed to introduce an agreement, dated November 4, 1899 (two days after the agreement of lease from McShane and Creighton to Graham was made), between McShane and Rutan, and to show that Aldrich prepared it as attorney for Rutan. This document, he says, he was shown by Rutan at or after the dinner with him of 1905, and first learned of it then. By this agreement McShane promised Rutan in consideration of his ''services rendered in aiding and negotiating a certain lease'' between McShane and Graham to pay him ''one cent per barrel'' on all oil on which he, McShane, should receive royalty under the lease, until Rutan should have received thirty thousand dollars, or ''in the event'' that McShane ''should sell said lands or any part thereof to any assignee of said lease contract upon any terms the purpose or effect of which is to obviate the payment of royalty to the party of the first part under the terms of said lease contract,'' to pay said Rutan the sum of thirty thousand dollars.

Finally, as a part of his case in defence, Mathias offered in evidence the correspondence between McShane and Aldrich alluded to in the memorandum of August 1, 1901. It consisted of a letter signed by Aldrich, Mathias & Phipps to McShane, dated June 3, 1901, which letter, after reciting the negotiations by McShane of the lease to Graham in November, 1899, and the agreement with Rutan of November 4, 1899, above mentioned, proceeds:

"The Byrd Syndicate, to whom this lease had been assigned, did not by the resolution of its directors accept the assignment by Graham to it of said leasehold rights and afterwards forfeited its rights under said lease. This forfeiture was confessed by it, as. I understand, and you have since negotiated a new lease with said Syndicate for a portion of the property and at a less royalty per barrel, and take the position that you are not indebted to F. C. Rutan under the before mentioned contract.

"Upon our understanding of the facts, we concur in this position and have agreed to assist you without expense to you in the event that Mr. Rutan brings action against you to recover said commission. We have also been of assistance in other matters and in consideration of which contract on our part and services, you have agreed, only in the event that you are not held liable to Mr. Rutan, in payment of our legal services to you to pay us $30,000 at the rate of one cent per barrel on oil produced under the present lease with the Byrd Syndicate as and when produced and not otherwise until the total payments amount to the sum of $30,000.

"This letter is intended as an agreement on our part to render the services expected of us as and when required, and is designed to contain a statement of the conditions upon which you are to make the payments aforesaid. Will you kindly advise us by letter if you so agree? Upon receiving an answer in the affirmative, the correspondence will constitute a contract which can be put in more formal shape at any time if you so desire."

The answer of McShane is dated June 29, 1901, and is addressed to Aldrich personally. On the subject discussed in the preceding letter it says:

"With reference to the matter of commission to F. C. Rutan as mentioned in your favor of the 3rd instant, I would say in the main the same is correct, which was that should I not be called upon to pay Mr.

Rutan or his assigns the commission, it was my inten-
tion to pay the amount to you.''

Although this detailed recital of the proposed de-
fense has seemed necessary in order fairly to state it,
its discussion can be made brief. It was rejected by
the court below on the ground that it was not within
the jurisdiction of a court of law to take cognizance
of it; that if it justified any relief, that relief involved
equitable jurisdiction. This view is, in our opinion, in
accordance with authority. It is apparent that this
defense, under the guise of asserting a want of con-
sideration, ''seeks to open partnership accounts,''
which the Supreme Court of Illinois in Johnson v.
Wilson, 54 Ill. 419, said could not be done in a court of
law, citing Rogers v. Rogers, 1 Hall Reports, 391, (436
in the 2nd edition), in which the Supreme Court of
New York used language very applicable to the case
at bar: ''If the defendant relies on partnership
transactions as a defense to an action at law, his course
obviously is to go into a court of equity, which alone
has the power to investigate accounts between part-
ners and to do justice between them.''

But apart from the incompetency of the proposed
defense in a court of law, as distinguished from one
of equitable jurisdiction, we think it had the inherent
defect of insufficiency in either jurisdiction. In all the
evidence suggested and rejected, even if it should be
accepted as true, there is nothing showing fraud or
fraudulent concealment by Aldrich in treating with
Mathias. The contract between McShane and Rutan
drafted by Aldrich was not necessarily inconsistent
with the opinion of Aldrich expressed in his letter
of June 3, 1901, that McShane ''was not indebted to
Rutan under the before mentioned commission con-
tract.'' The indebtedness depended on the circum-
stances and facts concerning the alleged forfeiture

of rights by the Byrd Syndicate under the Graham contract and the negotiation and execution of the subsequent lease directly to that Syndicate.

It may have seemed very plain to Rutan that he was entitled to the $30,000 involved, and he may have so informed Mathias at the 1905 dinner, but McShane in his letter of reply to Aldrich in 1901 certainly did not repudiate Aldrich's assertion that he (McShane) entertained a different opinion. The correspondence, as we have said, was not withheld from Mathias, so far as appears. He could probably have seen it had he asked for it in 1901, as well as in 1905, and it is hardly just that after three times accepting a settlement, which he had opportunity to investigate, of the unliquidated claim for the diversion of Aldrich's time (once when the charge was made on the books in 1901, once when the firm was dissolved in 1902, and once when the notes were given in 1904), he should be allowed in 1905 to repudiate it on learning, as he might on investigation have learned before, that Aldrich's opinion as to the value of the charge was perhaps or even probably erroneous. For it was not a fact, but an opinion, that Aldrich is charged to have stated in asserting that it was "good," and the statement of an opinion of this kind to one who has the means of testing it is not a misrepresentation that can be treated as a fraud.

We think the settlement of the partnership affairs between the plaintiff and defendant in May, 1904, must, for the purposes of this case at least, be held final.

So holding, we see no merit in the contention that this suit on promissory notes could not be brought by the plaintiff at law. "When parties have settled their partnership accounts and a balance is ascertained, an action of assumpsit will lie for money due on an account stated." Hanks v. Baber, 53 Ill. 292, 294. *A*

*fortiori*, when the account stated has been evidenced by and converted into promissory notes, will such an action of assumpsit lie. Unpaid bills and accounts due to the firm are not "partnership accounts" in the sense in which those words are used in the preceding quotation. Their existence and the fact that if and when collected they are to be divided between the parties according to a predetermined rule of division, does not render the "settlement" between the parties less final.

The judgment of the County Court is affirmed.

*Affirmed.*